JUDGE PHILIP MARTINEZ

Filed 3-10-06
Clerk, U. S. District Court
Western District of Texas
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

RECEIVED

ERNESTO CASAS,           )
                         )
        Plaintiff,       )
                         )
v.                       )
                         )
CITY OF EL PASO,         )
                         )
        Defendant.       )

EP06CA0101

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Ernesto Casas (hereinafter "Mr. Casas") complains of the City of El Paso, Texas (hereinafter "the City"), and for cause shows the Court the following:

### Parties, Jurisdiction, and Venue

1.      Mr. Casas is a citizen of Mexico, lawfully admitted into the United States for permanent residence, age 44, and a "qualified individual with a disability," within the meaning of Title II, Section 201 of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12131(2), and the Rehabilitation Act of 1973, hereinafter "the Rehab Act"), 29 U.S.C. § 705(20). He is also an individual with a physical and mental impairment which makes him unable, without the assistance of another individual, to use public transportation services, within the meaning of 42 U.S.C. § 12143(c)(1)(A)(i).

2.      The City is a municipal corporation, duly organized and existing under the laws of the State of Texas, and a "public entity" within the meaning of Title II, Section 201 of the ADA, 42 U.S.C. § 12131(1)(A). The City "operates" a "designated public transportation" entity which operates on a "fixed route system," as those terms are defined in Title II, Section 221 of the ADA, 42 U.S.C. § 12141(2)-(4). The City also attempts to provide "paratransit and other special

3

transportation services" to disabled persons, in compliance with Title II, § 223(a) of the ADA, 42 U.S.C. § 12143(a). The City operates its designated public transportation, fixed route system, and paratransit services (locally known as "The Lift") through an entity known as "Sun Metro."

3.      The City's hereinafter actions, inactions, and failure to comply with the ADA and the Rehab Act all occurred in El Paso County, Texas, making venue proper in this Division and Court, under 28 U.S.C. § 1391(b).

4.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

**Statement of Facts**

5.      Mr. Casas suffers from post-traumatic stress and major depression disorders as a result of a physical assault on his person in 1997.  His musculo-skeletal injuries from that incident never completely healed.  Because of his mental and physical disabilities, Mr. Casas is significantly limited in major life activities which are central to the daily lives of most people, including (without limitation) caring for himself, working, interacting with other people, and using public transportation.  He also has a record of disabling impairments and is regarded as disabled by the City, which, for some years, has provided him a disability pass enabling him to ride free on Sun Metro buses.  Mr. Casas' bus card is a "PCA" card, which supposedly enables both him and a "personal care assistant" to ride free.

6.      The City and Sun Metro have a statutory duty to provide disabled persons comparable transportation services to those enjoyed by the general public, through paratransit "and other special transportation services," including free transportation for a personal care assistant.  ADA § 223(a) and (b)(1)(A)(i) and (B), 42 U.S.C. § 12143(a) and (b)(1)(A)(i) and (B). The implementing regulations mention personal care assistants only in connection with

2

paratransit service.  49 C.F.R. § 37.123(f)(1).  However, the City's paratransit services do not comply with applicable regulations about response time, 49 C.F.R. § 37.131(b), pickup times, Id. (b)(2), advance scheduling, Id. (b)(4), fares, Id. (c), waiting list for access, Id. (f)(2), untimely pickups, Id. (f)(3)(i)(A), and excessive trip length, Id. (f)(3)(i)(C).  Because of the non-compliant nature of its paratransit service, the City provides disabled persons, such as Mr. Casas, PCA cards which can be used on fixed routes, as a "special transportation service," within the meaning of the ADA sections cited above in this paragraph.

7.     As often as possible, Mr. Casas takes one of his two older sons with him to be his personal care assistant.  However, beginning about November 27, 2003, various drivers for Sun Metro refused to honor the "PCA" designation and required Mr. Casas to pay for his sons' fares.  This occurred about ten times over the next seven and a half months.  On all of those occasions, Mr. Casas paid his sons' fares without protest.

8.     On or about July 15, 2004, Mr. Casas protested when a Sun Metro driver refused to let his son ride free.  An argument ensued and the driver called a security guard, who threatened to handcuff Mr. Casas, frightening his son.  Mr. Casas asked the driver and the security guard, "Please call Sun Metro," but they refused.  He got them to let him use a cell phone to call Sun Metro himself, but the police arrived shortly thereafter and made him terminate the call.

9.     Mr. Casas complained about the foregoing treatment to Sun Metro employee Luis Lujan, who had issued the PCA card to him.  However, on or about January 13, 2005, a series of similar incidents occurred.  On that date, three different bus drivers, on three different routes, refused to honor the PCA designation on Mr. Casas' card.

10.     On or about April 18, 2005, Mr. Casas sought the assistance of the undersigned attorney in connection with the foregoing incidents.  The attorney contacted the City's in-house counsel on or about April 26, 2005.  Eventually, Assistant City Attorney Guadalupe Cuellar scheduled an interview for July 14, 2005, with Mr. Casas, his son, and the undersigned attorney.

11.     To attend that meeting, it was necessary for Mr. Casas to use Sun Metro service to travel from his home to City Hall.  When he and one of his sons attempted to use the PCA card for both of them, the Sun Metro driver at first refused in a loud and angry tone of voice.  Mr. Casas quietly disagreed, until the driver finally relented and allowed them to board without paying.  However, the driver's behavior drew the attention of most (if not all) of the other passengers, many of whom stared at Mr. Casas and his son, causing both of them discomfort and embarrassment.

12.     The meeting did take place as scheduled on July 14, 2005, and led to an investigation by Sun Metro between July 21 and August 4 of 2005.  On the latter date, Ms. Cuellar informed Mr. Casas and his attorney that the problem had been corrected:  "All bus operators have been issued a memo concerning the PCA policy.  The entire fleet also received text messaging reiterating the PCA policy.  Supervisors in the northeast [where most of the incidents had occurred] were also directed to remind their bus drivers of the PCA policy."

13.     Notwithstanding the apparent resolution, another incident occurred on October 14, 2005.  A Sun Metro driver refused to honor the PCA authorization and said he did not know what "PCA" stood for.  Mr. Casas and his son tried to explain, and the driver responded with open skepticism.  Mr. Casas even tried to show the driver the letter from the City Attorney's office, but the driver refused to read it.  By this time, the other passengers were all watching the argument.  Mr. Casas reached in his pocket to see if he had the money to pay his son's fare, but

the driver changed his mind at the last minute and told them to go and sit down.  Once again, Mr. Casas and his son felt uncomfortable and embarrassed, so much so that they had to leave the bus several blocks before their scheduled stop and complete their journey on foot.

14.     On or about October 20, 2005, the undersigned attorney notified the City Mayor of possible claims under the ADA and state law based on the foregoing incidents.  The Mayor referred the matter to the City Attorney, where an assistant promised to investigate.

15.     Also on October 20, 2005, Mr. Casas and one of his sons once again experienced problems on a Sun Metro bus.  When Mr. Casas showed the driver the PCA card, the driver looked confused and said, "What?"  Mr. Casas replied, "He's my PCA."  The driver responded, "I don't know what that means."  An argument ensued, during which all of the bus passengers were inconvenienced and delayed.  Finally, the driver allowed Mr. Casas and his son to board without either of them paying, but other bus patrons stared at them throughout their journey.

16.     On or about December 1, 2005, Mr. Casas needed to use Sun Metro transportation for a medical appointment.  With a friend, he boarded a Sun Metro bus and showed the PCA card.  The driver was both skeptical and angry about the card, but motioned for the two men to sit down.  Because the driver appeared upset, Mr. Casas asked him whether he wanted them to leave the bus.  The driver raised his voice and said in an angry tone, "Either go and sit down or get off the bus."  Once again, the other passengers were paying attention to the entire incident, and Mr. Casas and his friend overheard one of them talking disparagingly about their failure to pay.

17.     On January 25, 2006, the City Attorney responded to Mr. Casas' pending written complaint by citing the written instructions transmitted to Sun Metro employees more than six months earlier.  The City Attorney also included the following statement in the written response:

"I do not believe that your client has experienced any similar events in the recent past. However, please let me know if I am mistaken." That statement was disingenuous at best, false at worst, in light of Mr. Casas' prior specific complaints about his treatment on Sun Metro buses.

### Cause of Action

18.     The City has intentionally excluded Mr. Casas from participation in and denied him the benefits of its services, programs, and activities, and has subjected him to discrimination. Furthermore, the mistreatment of Mr. Casas on Sun Metro buses constitutes retaliation for his exercise of his ADA-protected right of reasonable access to public transportation. At no time has Mr. Casas engaged in any conduct to justify the City's discriminatory and retaliatory conduct against him.

19.     Mr. Casas is likely to continue to suffer the irreparable harm of inconvenience and indignity if the City is not enjoined from its refusal to honor his PCA card.

20.     Because of his repeated and unjustified humiliation on Sun Metro buses, Mr. Casas has experienced, and will in reasonable probability continue to experience, pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. Each of the foregoing incidents, including the three occurring on one date, constitutes a separate and discrete ADA violation.

### Request for Preliminary Injunction

21.     Mr. Casas will suffer irreparable harm if the City is not enjoined during the pendency of this lawsuit from instigating ugly confrontations with Mr. Casas and his personal care assistants on Sun Metro buses. As a mentally disabled individual, Mr. Casas experiences harm that is not precisely measurable and cannot be undone by an award of monetary damages. The City's apparent unwillingness to impose – or even threaten – disciplinary measures leaves Mr. Casas at the mercy of drivers who will persist in humiliating him whenever they wish. He

has complained repeatedly to the City without effect.  The latest written response denies that complaints have been made.

22.     There is a substantial likelihood that Mr. Casas will prevail on the merits.  His allegations are supported by multiple witnesses.

23.     The harm faced by Mr. Casas outweighs the harm that would be sustained by the City if the preliminary injunction were granted.  The preliminary injunction would actually help the City by stopping the repeated ADA violations, each of them separately compensable.  The City Manager, City Attorney, and management of Sun Metro have nothing to gain by hurting Mr. Casas. They are merely indifferent to whether their drivers do so.  A preliminary injunction would overcome that indifference.

24.     Issuance of a preliminary injunction would not adversely affect public interest and public policy.  On the contrary, public policy expressed in the ADA favors the injunction.

25.     Mr. Casas asks the Court to set his application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, issue a preliminary injunction against the City.

### Request for Permanent Injunction

26.     Mr. Casas asks the Court to include application for injunctive relief in the full trial on all issues in this complaint and, after the trial, to issue a permanent injunction against the City.

### Conclusion and Prayer

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays for a preliminary injunction, followed by a permanent injunction, compensatory damages, attorney fees, expert witness fees, his other costs of court, and such other and further relief as to which he may show himself justly entitled.

**RESPECTULLY SUBMITTED** this 7-th day of March, 2006.

**MIKE MILLIGAN**
303 Texas Avenue, Suite 808
El Paso, Texas 79901
915-544-5587
Fax 915-544-2773
Texas Bar No. 14148200
Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands trial by jury herein.

**MIKE MILLIGAN**